Lacene Manufacturing Corporation v. Commissioner.
Lacene Mfg. Corp. v. Commissioner
Docket Nos. 107843 and 108404.
United States Tax Court
1944 Tax Ct. Memo LEXIS 248; 3 T.C.M. (CCH) 473; T.C.M. (RIA) 44161; May 17, 1944
*248 H. LeBaron Sampson, Esq., and Jay B. Angevine, Esq., for the petitioner. James T. Haslam, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: These consolidated proceedings challenge deficiencies in income and excess profits taxes as follows: Excess
Docket No.
Year
Income Tax
Profits Tax
107843
1937
$22,970.01
$19,519.36
108404
1935
20,650.63
7,416.77
1936
18,548.29
18,299.29
1938
21,414.24
15,993.34
1939
23,947.72
18,761.33
Some of the issues presented by the pleadings have been conceded. The effect of these concessions as well as unchallenged portions of the deficiencies will be reflected under Rule 50. The only remaining question for decision is: What are reasonable license fees to be deducted from petitioner's gross income for the use of certain patents. Findings of Fact The parties have stipulated certain of the facts, which we hereby find accordingly. Facts otherwise found from the record and a summary of the stipulated facts are as follows: Petitioner, a New Hampshire corporation organized on August 23, 1933, is wholly owned by North American Holding Company (hereinafter referred to as Holding), *249 a New York nonstock membership corporation organized for the sole purpose of holding property, collecting the income therefrom, and paying it over to certain organizations whose income is exempt from the Federal income tax. The income of Holding is also agreed to be exempt from Federal income taxation under section 101 of the applicable revenue acts. Its income is paid to the Maxwell School of Citizenship, Syracuse, New York. Prior to August 1, 1933, Holding wholly owned the Lacene Manufacturing Company (hereinafter referred to as Company). Company was the predecessor corporation of petitioner. Company owned, in August, 1933, 26 unexpired patents on machinery used in the processing of leather soles, lifts, and taps for shoes. It manufactured machines under these patents and leased them to users in the shoe industry. Soles are cut from tanned hides. Individual hides vary in thickness in different parts and so do the soles cut from them. For use in shoes, soles must be of uniform thickness throughout. For various reasons which will appear below, the thickness of each sole is measured at all points. This is called "grading." In the trade the standard of measurement used in determining *250 thickness is called an "iron." A "9-iron" grade is 9 irons thick at its thinnest part. Soles are sold by their "grade." It is important to buyers and sellers of soles to know the exact grade (i.e., measurement in irons at the thinnest point) since if they are graded too thick, the seller loses, and if they are graded too thin, the buyer loses. Therefore, tanners who sell to cut-sole manufacturers, cut-sole manufacturers who sell to shoe manufacturers, and shoe manufacturers themselves grade soles for purposes of keeping sales transactions correct. After soles are graded all thickness above the thinnest part is cut off. This is called "evening." It is important that soles be accurately "graded" before "evening" since if a sole is graded too thin, leather is wasted in "evening," and if it is graded too thick, the end product is not of uniform thickness. Cut-sole manufacturers grade and even some soles before selling them to shoe manufacturers; others they only grade. Shoe manufacturers grade soles, then even them, then grade them for matching into pairs. Lifts and taps are similarly graded and evened. Company's patents covered machinery used for grading and evening soles, taps, and *251 lifts, and other related processes. Lessee-users of the machines paid rents or royalties based on the output of the machines. Company serviced the machines for users, keeping them in repair and improving them. Lessees paid for new parts as though they were purchasing them, but Company retained title. Company's income was augmented by certain installation charges and the sale of a few machines outside the United States. The results of the business for the years indicated are shown by the following table: 1929
1930
1931
1932
Royalties Received
$272,824.70
$245,861.97
$238,478.63
$216,648.16
Taxable Income Reported
167,266.14
138,866.50
133,729.98
136,626.35
Dividends Paid
160,000.00
120,000.00
140,000.00
135,000.00 All dividends were paid to Holding, the sole stockholder of Company. The royalties were received from the machines on lease, which numbered 888 just prior to August 1, 1933. The machines leased were of four types: The Nichols Evening and Grading Machine, the Semi-Automatic Grader, the Cogswell Automatic Grader and Distributor, and the Grading and Fleshing Machine. A different but standard type of lease was used for each machine. Leases for Semi-Automatic *252 Graders and Cogswell Automatic Graders and Distributors specified no term. Leases for the other two types of machines provided that the lease should continue for 17 years unless terminated by either party "as above provided." After two years from the date of the lease either party had the right to terminate the lease at the end of any year dating from the execution of the lease on giving 30 days notice prior to the end of the year. Petitioner, as will appear below, acquired all of Company's leases. At the time it acquired them it acquired the right to terminate within one year every lease which, at the time of termination would have run for two years or more. The evidence does not show which of the leases had been outstanding for two years or more at the time petitioner acquired them. By August 25, 1935, however, every lease which had been granted by Company had run at least two years. The number of machines on lease on August 1, 1933, was as follows: Nichols Grading and Evening Machine
695
Fleshing Machine
37
Semi-Automatic Grader
122
Cogswell Grader and Distributor
34
Royalties received by Company in the four years 1929-1932, inclusive, averaged approximately $243,500 *253 per year. Income from installations and machines sold averaged roughly $2,600 per year and income from the sale of parts averaged about $13,000 per year during the same period. Reported net income for these years averaged approximately $144,000 annually. During the same years Company employed an average of 24 employees and of these only 9 or 10 were engaged in its machine shop in which machines and parts were made. A balance sheet for Company as of August 1, 1933, showed the following: ASSETS
Real Estate
$ 24,165.88
Less Depreciation
6,163.66
$ 18,002.22
Machinery and Tools
2,148.12
Less Depreciation
1,163.88
984.24
Fixtures
3,194.63
Less Depreciation
1,719.12
1,475.51
Leased Machines
160,895.00
Less Depreciation
101,545.76
59,349.24
Machine Parts
6,839.05
Patent Expense Deferred
4,241.21
Suspense Account
345.00
Accounts Receivable
8,154.28
Cash
8,909.72
Advances to Salesmen
365.00
Patents
49,717.04
Less Depreciation
20,110.70
29,606.34
Investments
16,610.00
$154,881.81
LIABILITIES
Loan
$ 1,500.00
Federal Taxes for 1933 (7 months)
11,000.00
Federal Taxes for 1932 (balance)
9,393.06
Capital and Surplus
132,988.75
$154,881.81
*254 A correct book value of Company's assets properly reflecting the replacement costs of its machines on lease and machinery and tools would have been approximately $31,500 greater than the book value stated above. Allowing for this correction Company's replacement value was approximately $118,000, exclusive of patents and investments. As part of a single plan petitioner was created in August, 1933, and shortly thereafter Company was liquidated. Pursuant to the plan Company sold all its assets except its patents, patent applications, and investments to petitioner and assigned the remaining assets to Holding. The various steps in the transaction were as follows: By an agreement dated August 24, 1933, but stated to take effect as of August 1, Company transferred all its assets except its patents, patent applications, and investments to petitioner, and in exchange petitioner assumed Company's liabilities and issued 1,000 shares of its stock (the entire amount issued) to Holding at Company's request. The terms of this agreement were in part as follows: "For and in consideration of the receipt by the party of the first part [Company] of One Thousand Shares (1,000) of the capital stock *255 of the party of the second part [petitioner] * * * composing the entire authorized issue of such capital stock, the receipt of which is hereby acknowledged, the party of the first part agrees to sell, grant, convey, assign and set over unto the party of the second part, all of its assets of every name and nature, real, personal and mixed, excepting any patents and/or applications for patents owned by it, whether held in its name or otherwise; * * * the assets hereby agreed to be conveyed including the real estate of said first party * * * where its office and present plant is located; all machinery and fixtures connected with such office and plant; all machines and supplies owned by it wherever located; and all cash on hand, goods made and in process of manufacture, accounts receivable, contracts, franchises and good will." A bill of sale under this contract was delivered on September 11, 1933. Company proceeded to liquidate its investments on September 25, 1933, assigned the proceeds thereof and its patents and patent applications to Holding. It was then liquidated. The assignment provided in part: "WHEREAS, NORTH AMERICAN HOLDING CORPORATION * * * is desirous of acquiring the *256 entire right, title and interest in, to and under said Letters Patent, and each of them; "NOW, THEREFORE, be it known that in consideration of One Dollar to it paid by said NORTH AMERICAN HOLDING CORPORATION * * * said LACENE MANUFACTURING COMPANY has sold, assigned and transferred, and by these presents does sell, assign, and transfer unto said NORTH AMERICAN HOLDING CORPORATION, its successors and assigns, the entire right, title and interest in, to and under the following Letters Patent * * * the same to be held and enjoyed by said NORTH AMERICAN HOLDING CORPORATION, its successors and assigns, to the full ends of the terms for which said Letters Patent, and each of them, are or may be granted, as fully and entirely as the same would have been held and enjoyed by the said LACENE MANUFACTURING COMPANY, had this assignment and sale not been made." A licensing agreement (hereinafter referred to as Licensing Agreement No. 1), dated August 24, 1933, but delivered in the latter part of September after Company had assigned its patents to Holding, was entered into by petitioner and Holding. By this agreement Holding "gave an exclusive license to the petitioner to use and to authorize *257 others to use for one year from August 1, 1933, the patents which it had acquired from Lacene Manufacturing Company, in return for a royalty at the rate of $120,000 a year, which the petitioner agreed to pay so long as it made or leased any of the patented articles." The agreement provided that the license should continue from year to year and the amount of the royalties should be the subject of mutual adjustment between the parties prior to August 1 of each year. The patents were described in the agreement itself only by their number. The agreement provided, inter alia: "WHEREAS, for the consideration hereinafter contained, the party of the first part [Holding] has agreed to and with the party of the second part [petitioner], to license and authorize the said Lacene Manufacturing Corporation as party of the second part, its successors and assigns, to make the patent articles specified in said patents for the period of one year from August 1, 1933, in the manner hereinafter particularly specified: - Now, in pursuance of said Agreement and in consideration of the covenants * * * hereinafter entered into on the part of * * * [petitioner] and in consideration of the sum of one *258 hundred twenty thousand dollars ($120,000.00) paid and to be paid * * * in equal monthly installments * * * the said * * * [Holding] does hereby give and grant unto * * * [petitioner] during said term of one (1) year, subject to said rights being limited by the expiration of any of said Letters Patent, full and free liberty, license, power and authority to make said invented and patented articles, and to extend during said period of time to any and all persons, firms or corporations, a license to use any of the articles so invented and patented and/or to vend or sell any of the invented or patented articles of the nature and kind which were formerly vended and sold by said Lacene Manufacturing Company * * * "And * * * [petitioner] hereby covenant [sic] * * * that it * * * will not at any time during said term, or such future term as may be granted * * * grant any license to any other person, firm, or corporation, to make or vend the said articles, without the special license and consent of * * * [Holding] in writing * * * * *
"And * * * [petitioner] agrees so long as it shall make, vend, sell or lease any of the said invented and patented articles before mentioned, pay to [sic] *259 the party of the first part a royalty of one hundred and twenty thousand dollars ($120,000.00) for the first year * * *." In the period following August, 1933, and through the years in question petitioner manufactured, leased, serviced, and sold the same four types of machines which Company had manufactured, leased, serviced, and sold, with the exception of the fact that patented improvements were added to the various machines from time to time. The leases used by petitioner were in substantially the same form as those used by Company with the exception that petitioner appeared as the lessor in the agreements. Holding continued to own the patents it received from Company and from time to time it acquired new ones and these were the subject of further licensing agreements between Holding and petitioner. The subsequent licensing agreements designated by numbers were as follows: Licensing Agreement No. 2. On November 7, 1933, Holding "gave an exclusive license to the petitioner to use, and to authorize others to use, for the period of one year" an additional patent in consideration of $5,000 paid and $1,000 per month license fees beginning on May 7, 1934. The patent referred to was *260 issued July 14, 1933. The agreement was from year to year and the annual royalty was to be the subject of mutual adjustment prior to November 7 of each year. This agreement was superseded by Licensing Agreement No. 3. Licensing Agreement No. 3. On January 2, 1935, Holding "gave an exclusive license to the petitioner to use, and to authorize others to use, for the period of one year" four additional patents and also the patent covered in agreement No. 2, and petitioner agreed "to pay royalty at the rate of $20,000 per year * * * so long as it made or leased any of the patented articles." The agreement was from year to year and the amount of royalties was subject to mutual adjustments prior to December 1 each year. The four new patents licensed were granted in December, 1933, February, 1934, and March, 1934, respectively. Licensing Agreement No. 4. On May 31, 1935, Holding "gave an exclusive license to the petitioner to use and to authorize others to use" an additional patent for the life of the patent, in consideration of $5,000 paid and further payments of $5,000 per year in advance beginning on June 1, 1936, during the life of the patent. The patent referred to was granted in June, *261 1934. Licensing Agreement No. 5. On November 27, 1935, Holding "gave an exclusive license to the petitioner to use, and to authorize others to use" an additional patent dated May 21, 1935, for the life of the patent, in consideration of $5,000 paid and further payments of $5,000 per year during the life of the patents. Licensing Agreement No. 6. On September 9, 1936, Holding "gave an exclusive license to the petitioner to use, and to authorize others to use" two additional patents dated September 1, 1936, for the life of the patents in consideration of $10,000 paid and further payments of $10,000 per year in advance beginning September 9, 1937, during the life of the patents. Licensing Agreement No. 7. On July 26, 1937, Holding and petitioner agreed "that for the year beginning the first day of August, 1937, the royalty under license agreement No. 1 should be reduced to $108,000 a year to be paid in equal monthly payments of $9,000 each, and the royalty under license agreement No. 3 should be increased to $48,000 a year to be paid in equal monthly payments of $4,000 each." It was further provided that the right of petitioner to use all of Holding's patents should continue from *262 year to year and the amount of the yearly royalty should be the subject of mutual adjustment between the parties prior to July 1 of each year the agreement was in force. As a result of the various licensing agreements petitioner accrued on its books license fee liabilities in the following amounts: 1935
$150,000.00
1936
153,333.33
1937
170,000.00
1938
176,000.00
1939
176,000.00 The $176,000 license fees were based on the needs of Holding to meet its obligations calling for $175,000 a year, $75,000 of which would be for operating the school and $100,000 towards the accumulation within ten years of a $1,000,000 endowment. The number of machines in use during the years in question was as follows: Nichols Grading &
Fleshing
Semi-Automatic
Cogswell Grader
Evening Machine
Machine
Grader
& Distributor
Dec. 31, 1935
693
33
190
22
Dec. 31, 1936
707
32
203
24
Dec. 31, 1937
687
31
218
25
Dec. 31, 1938
658
26
230
23
Dec. 31, 1939
625
16
231
22
The demand for new machines was limited. The number of new machines put out by petitioner during these years, all of which were semi-automatic graders, was as follows: 1935
17
1936
13
1937
13
1938
12
1939
4
*263 The average annual royalty received by petitioner for each leased machine during the years 1935-1939, inclusive, was $274.68. The machines were distributed among a total of 250 customers. As part of its lease agreements petitioner serviced the leased machines, added repair parts and new improvements when they were brought out. In adding repair parts the price was as though they were sold but petitioner retained title. The machines put out by petitioner were not difficult to manufacture and could have been made by any good machine shop. The cost of building an evening and grading machine or a grading and fieshing machine was $225. A Cogswell automatic grader and distributor and a semi-automatic grader each cost $125. The total amount received by petitioner in each of the years 1935 to 1939 for royalties, installation charges and machines sold, and "sales" of parts were as follows: Royalties
Installation Charges
Sale of
Total
Received
Machines Sold
Parts
Received
1935
$260,928.15
$3,480.00
$12,569.74
$ 276,977.89
1936
267,122.25
3,050.00
12,295.87
282,468.12
1937
274,631.61
5,250.00
13,064.58
292,946.19
1938
237,651.24
4,810.00
12,118.80
254,580.04
1939
252,281.79
3,555.00
10,386.69
266,223.48
$1,373,195.72
*264 These "gross receipts" averaged $274,639.14 per year. Five or six machines were sold by petitioner during these years for use outside the United States. Petitioner kept its books on an accrual basis and its fiscal year coincided with the calendar years. It employed from 27 to 35 persons during the years in question, including three officers. Only 14 to 20 persons were employed in its factory, the rest being engaged in servicing machines and dealing with customers. Its total payroll and materials expenses were as follows: Total Payroll
Factory
Materials
Including Salaries
Payroll
Purchased
1935
$73,737.63
$20,948.21
$ 8,751.18
1936
74,107.00
21,137.00
7,999.40
1937
78,617.14
28,686.74
13,463.49
1938
67,700.53
23,202.53
8,475.22
1939
76,844.78
23,446.78
5,841.75
The income of petitioner for each of these years after deducting all expenses except Federal income taxes, license fees for the use of the patents, and any adjustment of Massachusetts excise taxes which may be required as a result of these proceedings, was as follows: 1935
$172,123.68
1936
168,394.12
1937
178,106.34
1938
142,776.58
1939
160,899.04 Petitioner paid no dividends *265 during these years. The grading and evening machine in a continuous operation graded a sole, stamped the grade on it, as well as any other desired symbol, indicated the grade to the machine operator by means of a visible indicator, and evened the sole to a uniform thickness. During the years in question there was no other machine on the market which could do the same work. The only alternative method of grading and evening was by grading by hand and evening on a splitting machine. An operator of this machine receiving one-half as much pay as a skilled hand operator could turn out twice as many soles. Grading by hand is not as accurate as machine grading. Ninety percent of the soles on shoes manufactured in the United States were graded and evened on these machines. Royalties for their use were 9 cents a hundred pairs (after discount for prompt payment) for the first 240,000 pairs a month and somewhat less for additional pairs. The widespread use of petitioner's evening and grading machines was due to their speed and accuracy which in turn resulted from the patents owned by Holding. A patent granted in 1931 (Patent 1820010) covered a device for unmeshing gears and materially increased *266 the accuracy of the machines. A patent granted in 1926 (Patent 1582140) covered three improvements to increase the speed and accuracy of the machines. One of these, the visible indicator used on all of petitioner's machines except the Cogswell automatic grader, increased speed by 20 percent. A patent granted in 1921 (Patent 1366889) increased speed of the machines by making it possible to release a sole automatically as soon as it was even and graded. A patent granted in 1931 (Patent 1835057) increased speed by permitting one blank to be evened while the following blank was being graded. The prototype of this machine was based on a series of patents some of which had expired. No machine built on expired patents could have successfully competed with the machine in use in 1933. That machine also represented a series of patents. Another important patent provided a means of stamping any desired symbol on the leather. It was granted in 1929 and would not expireuntil 1946. The patents on this machine would not expire within 10 years after August, 1933. The second machine petitioner made and leased, the semi-automatic grader, grades soles but does not stamp or even them. It is used principally *267 by cut-sole manufacturers who sell to shoe manufacturers, who in turn grade and even them. The operator is able to sort the soles by virtue of the grade being on the visible indicator. An operator using this machine can grade 5,000 to 6,000 pairs a day, whereas a hand grader would do only 1,600 pairs a day. The machine is also more accurate than hand grading. The highest royalty for its use is 6 cents a hundred pairs after discount and the rate decreased for all pairs over 240,000 per month. A 1934 patent (Patent 1945858) covered an improved device for speeding up the automatic feeding of the semi-automatic grader. A 1931 patent (1806166) covered a device to increase the accuracy in grading small pieces of leather. A 1936 patent (Patent 2052829) covering guides which prevented severing of the blanks in the measuring rolls increased accuracy in grading. There is not and has not been any other machine on the market that will do what this machine does. The basic patents on it were granted in 1926 and 1928 and, therefore, would not expire until 1943 and 1945. The third type of machine, the Cogswell automatic grader and distributor, grades and evens small pieces of leather-like lifts *268 for heels and automatically distributes them into compartments according to their thickness. The use of this machine is restricted because of the limited use of leather in shoe heels. The royalty charged users is three and one-half cents per hundred pairs for top lifts and two and one-half cents per hundred pairs of under lifts. A minimum royalty of $75 a year was charged on each machine. The basic patent on the machine was issued in 1928 and would not expire until 1945. The fourth type machine, the Lacene grading and fieshing machine, is substantially like the evening and grading machine, but is constructed to cut from an uneven sole an even predetermined thickness, leaving an uneven remaining portion. It is a special-purpose machine and not used extensively. No other machine could perform all of its operations. The highest royalty charged for its use was 9 cents a hundred pairs after discount, with an installation charge of $100 per machine. The basic patent on this machine was issued in 1929 and would not expire until 1946. None of the patents under which petitioner holds licenses have ever been successfully challenged in the Patent Office or in a court action.
The total book *269 value of petitioner's assets reflecting their depreciated value during the years 1935-1939 was as follows: 1935
$ 98,193.59
1936
103,602.88
1937
103,147.78
1938
100,892.77
1939
84,908.56 The average total book value for these years was $98,149.18. The replacement value of its assets property depreciated was approximately $30,000 more than the book value, making a total of approximately $130,000. The average value of depreciable assets during these years was $82,244. The net income of petitioner after taxes and all expenses, except license fees, averaging $164,466 annually during the years in question, was due largely to the protection resulting from the applicable patents. Petitioner might reasonably expect an average annual return of approximately 15 percent of its investment, or $20,000 per year. A return to petitioner of $20,000 per year would be sufficient to give it a reasonable net profit. Reasonable license fees to be paid to Holding in the years 1935 to 1939, inclusive, would be an amount sufficient to allow petitioner an annual net income of $20,000. Opinion The form in which this narrow controversy presents itself tends to create an atmosphere of almost *270 impenetrable unreality. The parties have agreed on a concise and simple statement of the issue: What is a reasonable deduction to allow petitioner for license fees to be paid for the use of certain patents? Petitioner concedes that, irrespective of formal contracts in which the amount of its royalty obligation was precisely specified, it is nevertheless limited by what may be determined to be reasonable. Cf. Helvering v. United States Industrial Alcohol Co. (C.C.A., 2nd Cir.), 137 Fed. (2d) 511. Respondent, on the other hand, recognizes that notwithstanding the control of petitioner by the licensor, petitioner is entitled to deduct a reasonable license fee. The parties are in accord that the problem may be resolved by determining what would be the terms agreed upon in arms-length negotiations. Nevertheless, every statement of the question raises at the threshold the necessity of presupposing facts which admittedly were absent in this instance. The parties did not deal at arm's length. But they did purport to make a contract. Except for tax purposes petitioner would have been no worse off no matter what it agreed to pay. It would have been, and in fact *271 was, prepared to commit itself to pay an amount in excess of actual earnings. And petitioner's sole stockholder would have been in an equally good position had it permitted petitioner to hand over its profits not through royalties but by way of dividends, as was the practice with petitioner's predecessor. There are certain inferential suggestions, including references to Gregory v. Helvering, 293 U.S. 465, which imply that the entire transaction may be treated as a sham, presumably with the result that no deduction whatever should be permitted. Cf. Higgins v. Smith, 308 U.S. 473. One difficulty with this contention, if it were made, would be its contradiction of respondent's concession that an amount found to be reasonable is a permissible deduction. Another is that if we disregard the corporate entity and treat this entire income as that of petitioner's licensor, the charitable character of the latter might exempt all of the income. Roche's Beach Inc. v. Commissioner (C.C.A., 2nd Cir.), 96 Fed. (2d) 776; Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578. *272 We take the view that in a proceeding of this sort in which the issues have been so narrowly defined by the parties, this aspect of the question calls for no further discussion, and throws the entire consideration back to the problem of determining the amount of a reasonable deduction. Respondent makes much of the case of Manchester Board & Paper Co. v. Commissioner (C.C.A., 4th Cir.), 89 Fed. (2d) 315 (see also 29 B.T.A. 108, reversed (C.C.A., 4th Cir.), 74 Fed. (2d) 838, in which the failure of some of the witnesses to base their valuation testimony upon certain aspects established by the evidence was held to vitiate their opinions. But we are, nevertheless, urged to dispose of this proceeding by making comparable and similarly erroneous assumptions. Only by imagining that licensor and licensee were strangers can the formula propounded by the parties for ascertaining permissible license fees be applied. It is manifest that petitioner's purchase of the assets and its licensing agreement were all part of the same transaction. But it is not conclusively apparent from the documents just what was *273 sold and what was licensed, a result not difficult to justify when we consider that the parties did specify the amount of the license fees and because of their intimate relationship had no occasion to particularize the privileges for which these fees were to be paid. Inferences may be drawn from some of the language as, for example, the provision permitting petitioner to license others to use articles "so invented and patented" and binding it to pay the royalties so long, not only as it shall make, but also so long as it shall lease, "any of the said invented and patented articles." These phrases may suggest that the license fees were intended to cover not only machines which petitioner might make but also those already in use if they consisted of the "invented and patented articles," which, of course, they did. But it is difficult to say that the language of the contract taken by itself is so clear and unambiguous as to set beyond all possible question the benefits for which the license fees were intended to be compensation. If, as petitioner contends, it acquired principally a license to lease out the existing machines and collect the rentals therefrom, and if, as the contract *274 provided, this privilege was limited to a single year, no businessman in his right mind could afford to pay any substantial license fee at all, and at the same time sink $130,000 of capital into the enterprise, taking the risk that its value would be entirely destroyed in a single year by the licensor's failure to renew. On the other hand, respondent contends that petitioner bought the machines and the accompanying leases, and thus acquired the right, without the payment of royalties, to lease the machines for the term of the patents and retain in full the resulting rentals, a benefit which the evidence shows represented in substance the entire value of the business. No such arrangement between reasonable men could possibly be anticipated with a capital investment of an amount so small as $130,000, which the history of the business demonstrated might result in profits approximating 100 percent annually. This is in any event a highly debatable contention, not only because of the consequent inadequacy of the consideration for property with earning power of such magnitude, but also because the installation of replacement and improvement parts, an integral part of the business conducted *275 under the leases, could not have been continued without the consent of the holder of the underlying patents. For reasons which must be apparent, however, we find it unnecessary to consider these opposing contentions in greater detail. The point is that the false assumption of arms-length agreement not only requires the elimination of the figures which the parties did in fact provide, but also of all other terms of the arrangement. It would, of course, be possible to speculate how long a term would be demanded by a licensee on the one hand or how much cash payment would be demanded by a licensor on the other and to indulge in the fruitless exercise of attempting to imagine how the two parties would ultimately resolve their conflicting airms. This might be essential if we were to concede the necessity of computing amortization of losses for which the parties would have to make provision. But we think the result of such an approach would be inconclusive at best, and we discard it here because it seems to us the result can be accomplished by a different method. Certain of the facts can be used as a point of departure by reason either of their acceptance by both sides or of their unchallenged *276 assertion. Thus, we know that petitioner's capital investment amounted to approximately $130,000, a figure "not subject to serious question" as being reasonable. We know that the ultimate profits were obtained by the manufacture, sale, and rental of machinery and that protection against competition was secured by a group of related patents. The profits came from the assets, and no special skill was required in the operation of the business. Part of the assets responsible for these profits was owned by petitioner and the balance by petitioner's licensor. Consequently, if the portion of the profits attributable to petitioner's share in the business can be determined, the balance, attributable to petitioner's licensor, would represent the reasonable amount to which the latter could be said to be entitled. It is true that we have no figure for the capital value of the part of the property owned by petitioner's licensor. But that in all probability would depend upon its earning power, which, of course, is the conclusion we are seeking and not to be expected as a premise. There is testimony in the record that a reasonable yearly return for petitioner to receive upon its capital investment *277 would be approximately 15 percent, or in the neighborhood of $20,000. This does not seem too low, and since proposed by petitioner, we need not find it too high. If this is an appropriate amount to allocate to petitioner's interest in the total business, the balance of its net earnings can be taken to approximate the return attributable to the interest in the total business owned by the licensor, and hence to represent reasonable license fees. Although this leaves the latter a variable and the former a constant, it is the constant with which we are concerned. The portion of the total earnings which is taxable to petitioner is the real issue, and the size of the license fees which may be deducted is the mere mathematical prerequisite for its ascertainment. It is also true that this constant is an average, rather than an invariable annual return. But there is nothing to show that the instant years were not average, normal years. We have accordingly concluded that in each of the years in issue petitioner was entitled to deduct from its gross income as royalties or license fees such amounts as would leave it with net income of $20,000. Decisions will be entered under Rule 50.